UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DONALD PLATTNER, ) | |
| ) | |
| Plaintiff ) | |
| ) | Case No. 03 C 2646 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| EDGE SOLUTIONS, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Donald Plattner ("Plattner") sued Edge Solutions Inc. ("Edge") for violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* (Counts I-IV) and for breach of fiduciary duty (Count V). The parties have filed cross-motions for summary judgment. Edge's motion for summary judgment is granted, and Plattner's motion for summary judgment is denied.

**I.    Background**

Plattner began experiencing financial difficulties following a divorce, and so in September 2000, he spoke with an Edge "financial counselor" to learn about the Debt Melt Down Program. On December 19, 2000, Edge sent Plattner a Debt Melt Down Program Agreement Letter ("Agreement Letter"), along with documentation explaining the Debt Melt Down Program. On December 22, 2000, Plattner signed the Agreement Letter to participate in the Debt Melt Down Program.

The Agreement Letter states: "The program is structured in a way to eliminate your debt over a period of time through settlement arrangements with your creditors." Under the heading

1

"Creditor Action and Credit Rating Disclosure," the Agreement Letter states: "It is understood that no representation about any aspect of your credit rating can be made. Depending upon circumstances, credit can be enhanced, damaged, or not be altered, but in any case, it is beyond the control or scope of this program." Under the heading "Post Debt Meltdown Procedures," the Agreement Letter states:

> If the fee paid to Edge is $600.00 or greater, you are entitled to participate in The Post Closing Credit Restoration Program. The purpose of this program is to assure that your credit reports properly reflect the settlement and paid accounts that involved this program. This program is voluntary for you and its success is dependent upon your proper participation and follow through as directed. Edge Solutions, Inc. cannot guarantee any specific results with regards to this program.

Under the heading "Debt Free Life Membership and Coaching Program," the Agreement Letter states that, for a monthly fee, Edge provides coaching about "combating debt problems and building future wealth." Richard Mauro, Chief Operations Officer for Edge, testified that this coaching does not include information on how to repair previously damaged credit, but may include information on how to reestablish credit, such as obtaining a "passbook loan" or a "secured credit card." Mauro Dep., 205:9-21.

Plattner also received a letter titled "How the Debt Melt Down Program Works," which he signed on December 22, 2000. This letter states:

> This program cannot make any assurances as to the state of your credit while on this program. It is likely that your credit score and rating will deteriorate while on the program. Upon completion of the program, Edge will work with you for 12 months in a best effort rehabilitation of your credit rating.

Edge sent another letter ("Dear Customer Letter"), which Plattner signed on December 22, 2000. This letter states: "We will make every attempt to minimize any damage to your credit while you are on the program, though it is probable for some deterioration to occur. This is not

2

unusual and we will help modify it upon completion of the program."

Plattner also received a document titled "Frequently Asked Questions." Under the heading "How Does the Program Effect Credit?" the document states:

> While on the program, the credit, will in all likelihood, [*sic*] suffer damage that occurs when accounts are not being paid. Of course, if you are late or delinquent at present, the difference may be minimal. However, once you are debt free, the accounts will indicate a paid or settled status. Within 6 to 12 months, you will be well on your way to total recovery.

Plattner paid Edge $7,000 (in $1,000 monthly installments) until he ceased participating in August 2001. The monthly installments were deducted directly from Plattner's bank account. Edge collected an initial retainer from Plattner of two times the monthly installment, or $2,000. Edge also collected fees equal to forty percent of the difference between the amount of the debt and the settlement amount when each debt was settled, and Edge collected a $50 monthly fee for the Coaching Program.

While Plattner was participating in the Debt Melt Down Program, Citibank refused to settle Plattner's debt and filed a lawsuit against him. Edge disclaimed representation of Plattner and recommended that he consider bankruptcy. It is disputed whether Edge told Plattner it would stop providing him services and Plattner then stopped payment on the monthly withdrawals from his account, or whether Plattner simply stopped payment without prompting from Edge. Edge refunded $221.61, the balance in Plattner's account.

During Plattner's participation in the program, Edge reached a settlement with Household, one of Plattner's creditors. Under the terms of this settlement, Edge was to make six payments of $676 to Household from Plattner's account. At the time Plattner ceased participating in the program, Plattner's account with Edge reflected that three of the payments

3

were made, but Household had only received two.  Thus, after Plattner ceased participating in the program, he made four payments to fulfill his remaining obligation to Household (the three remaining as well as the one that Edge deducted from his account but that Household never received).  Edge offered to refund the missing payment to Plattner in exchange for Plattner's release of any claims against Edge.

## II. Discussion

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  *Id.*  The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 321 (1986).

### A. Credit Repair Organization Act ("CROA")

In the complaint, Plattner alleged four violations of the CROA: (1) that Edge received compensation before it fully performed the promised services in violation of 15 U.S.C. § 1679b(b) (Count I); (2) that Edge did not provide Plattner with the required disclosures under 15 U.S.C. § 1679c prior to entering into the contract for services (Count II); (3) that the contract between Plattner and Edge did not contain terms required by 15 U.S.C. § 1679d(1) and (4) (Count III); and (4) that Edge did not provide Plattner with the cancellation form and disclosures

4

required under 15 U.S.C. § 1679e (Count IV).

Edge does not dispute that it failed to comply with the asserted provisions of the CROA; rather, Edge argues that its compliance was not required because it is not a credit repair organization within the meaning of the CROA. Plattner argues that Edge meets the definition of a credit repair organization and is thus liable for its failure to comply with the asserted provisions of the CROA.

15 U.S.C. § 1679a(3)(A) states that a "credit repair organization" is an organization that (1) used any instrumentality of interstate commerce, or the mails, to (2) sell, provide, or perform (or represent that it could) (3) in return for valuable consideration (4) services or advice about services designed to improve a consumer's credit record, credit history, or credit rating. *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005).[1] It is undisputed that Edge used instrumentalities of interstate commerce and the mails in communicating with Plattner and that Edge received consideration for the services that it provided to Plattner. Edge argues, however, that it did not sell, provide, or perform (or represent that it could) services or advice about services designed to improve a consumer's credit record, credit history, or credit rating.

The statutory definition of a credit repair organization is extremely broad. It reaches "any person" who uses an instrumentality of interstate commerce to perform services with, among other things, an "implied purpose" of improving a consumer's credit record. Since any

---

[1] 15 U.S.C. § 1679a(3)(A) states: "The term 'credit repair organization' means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of (i) improving any consumer's credit record, credit history, or credit rating; or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)."

debt management or counseling activity can be seen as having credit improvement as an implied purpose, some sense of the problem Congress intended to address with this statute is necessary to understand its appropriate limits. Case law interpreting the definition of a credit repair organization under the CROA is scarce.[2] Hence, the court will first review the legislative history of the CROA and then evaluate the representations Edge made to Plattner in light of the statutory language and the purposes of the statute.

        *1.*      *Congressional Intent*

As part of the CROA, Congress codified its findings and its purposes. 15 U.S.C. § 1679. The findings state:

> (1) Consumers have a vital interest in establishing and maintaining their credit worthiness and credit standing in order to obtain and use credit. As a result, consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.
> (2) Certain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters.

---

[2]Accordingly, the parties cite almost no case law in their briefs. The court notes that, in several cases discussing the statutory definition of a credit repair organization, the courts ultimately held that the defendant could be liable whether or not the defendant was a credit repair organization. In those cases, however, the plaintiff alleged violations of 15 U.S.C. § 1679b(a), which states that "[n]o *person* may" violate the provisions of that section; hence, the courts held that person is broader than credit repair organization, and that a finding that the defendant was a credit repair organization was required for liability. *See, e.g., Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005) (citing 15 U.S.C. § 1679b(a)) (emphasis added). Plattner did not plead any violations of 15 U.S.C. § 1679b(a).

     Here, the provisions Plattner alleged that Edge violated (15 U.S.C. § 1679b(b), § 1679c, § 1679d, and § 1679e) expressly limit their prohibitions and requirements to credit repair organizations. Thus, much of the existing case law does not provide the court with any assistance in determining whether Edge is a credit repair organization, the determinative issue in this case.

15 U.S.C. § 1679(a). The purposes of the CROA are:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and
> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

In addition to the codified findings and purposes contained in 15 U.S.C. § 1679, the House Report also sheds light on Congress' purpose and intent in enacting the CROA. That Report states:

> The credit repair business involves the marketing of credit repair services to consumers whose consumer reports contain adverse information that interferes with their ability to obtain credit. According to the FTC, these businesses, through advertisements and oral representations, lead consumers to believe that adverse information in their consumer reports can be deleted or modified regardless of its accuracy. . . . [S]uch representations by credit repair clinics are often misleading, and consumers, mostly low- and moderate-income individuals, are cheated out of the money they paid for services.

H.R. Rep. No. 103-486, at 57 (1994). The Report further states that credit repair companies often "inundat[e] consumer reporting agencies with so many challenges to consumer reports that the reinvestigation system breaks down, and the adverse, but accurate, information is deleted." *Id.* "[The CROA] seeks to regulate the industry to ensure that consumers are provided with necessary information about credit repair organizations so that they can make informed decisions regarding the purchase of their services and to protect the public from unfair and deceptive advertising and business practices by the industry." *Id.*[3]

---

[3]The court acknowledges that another court in this district has stated: "In enacting the [Consumer Credit Protection Act], of which the CROA is part of, Congress intended for courts to broadly construe its provisions in accordance with its remedial purpose." *Parker v. 1-800 Bar None, a Financial Corp., Inc.*, No. 01 C 4488, 2002 WL 215530, at *2 (N.D. Ill. Feb. 12, 2002)

7

## 2. *The Representations Made by Edge*

Whether a company is a credit repair organization under the CROA depends on the representations made. *See Polacsek v. Debticated Consumer Counseling, Inc.*, No. Civ. PJM 04-631, 2005 WL 3750247, at *6 (D. Md. Nov. 23, 2005) (stating that a credit counseling agency may be covered by the CROA "[d]epending upon the allegations of the Complaint"). The representations made by Edge are not in dispute, although the parties interpret the representations differently. The representations made by Edge can be divided into three categories: (1) the Debt Melt Down Program, (2) Debt Free Life Membership and Coaching Program, and (3) the Post Closing Credit Restoration Program. As discussed above, to be a credit repair organization, Edge must have (1) used any instrumentality of interstate commerce, or the mails, to (2) sell, provide, or perform (or represent that it could) (3) in return for valuable consideration (4) services or advice about services designed to improve a consumer's credit record, credit history, or credit rating. *Costa*, 390 F. Supp. 2d at 727 (citing 15 U.S.C. § 1679a(3)).

The allegations of the complaint do not suggest that Edge was a credit repair organization when it provided the Debt Melt Down Program. The Debt Melt Down Program documents make clear that participation in this program will likely result in damage to the participant's credit.

---

(citing *Brothers v. First Leasing,* 724 F.2d 789, 793 (9th Cir. 1984)). "Moreover, courts should construe consumer protection statutes liberally in favor of consumers." *Id.* (citing *Bizier v. Globe Fin. Serv., Inc.,* 654 F.2d 1, 3 (1st Cir. 1981)) (internal quotation omitted). The cases cited by the court in *Parker*, however, were decided prior to the enactment of the CROA. Given that Congress codified its findings and purposes as part of the CROA, it is proper for the court to interpret the CROA in light of Congress' expressed intent.

They also make clear that the participant's credit is outside the scope of the program.[4] Thus, in offering to provide the Debt Melt Down Program, Edge did not represent or even imply that this program was designed to improve the participant's credit as required for Edge to be a credit repair organization.

Nor was Edge a credit repair organization when it provided the Debt Free Life Membership and Coaching Program. The Agreement Letter stated that, for a monthly fee, Edge provides coaching about "combating debt problems and building future wealth." Richard Mauro, Chief Operations Officer for Edge, testified that this coaching does not include information on how to repair previously damaged credit, but may include information on how to reestablish credit, such as obtaining a "passbook loan" or a "secured credit card." Mauro Dep., 205:9-21.

Plattner argues that the definition of a "credit repair organization" encompasses any entity that suggests that its services or advice might ultimately result in an improved credit rating. As indicated above, Plattner's reading is arguably consistent with the broadest possible interpretation of the statutory language, but in light of the findings and purposes contained in § 1679, as well as the concerns expressed in the legislative history, there is no reason to believe

---

[4]The Agreement Letter stated, under the heading "Creditor Action and Credit Rating Disclosure": "It is understood that no representation about any aspect of your credit rating can be made. Depending upon circumstances, credit can be enhanced, damaged, or not be altered, but in any case, it is beyond the control or scope of this program." The letter captioned "How the Debt Melt Down Program Works" stated: "This program cannot make any assurances as to the state of your credit while on this program. It is likely that your credit score and rating will deteriorate while on the program." The Dear Customer Letter stated: "We will make every attempt to minimize any damage to your credit while you are on the program, though it is probable for some deterioration to occur." The Frequently Asked Questions document stated: "While on the program, the credit, will in all likelihood, suffer damage that occurs when accounts are not being paid."

9

that such a broad definition was intended by Congress. At least one court has held that a credit counseling organization acting purely as a credit counseling organization is not a credit repair organization because "[l]egitimate credit counseling, which endeavors to gradually improve clients' credit by encouraging creditworthy behavior going forward, is distinct from illegitimate forms of credit repair in which clients are given false hopes of absolution for confessed past credit sins." *Limpert v. Cambridge Credit Counseling Corp.*, 328 F. Supp. 2d 360, 364 (E.D.N.Y. 2004). Were Plattner correct, any entity that endeavored to assist consumers in paying their debts would, because debt payment assistance implicitly improves credit, fall within the scope of this statute. Since Congress was concerned with "credit repair organizations," this court reads the statute to reach such entities whose focus is the improvement or repair of a consumer's credit record, credit history or credit rating, expressly or implicitly, not entities whose activities are aimed at assisting consumers in developing "creditworthy behavior" and paying their debts, which may result in improved actual credit as a collateral consequence, rather than as a program objective.

The court thus agrees with Edge that Congress did not intend the CROA to apply so broadly that providing advice to customers about strategies or decisions for dealing with their debts that may, incidentally, have the effect of improving credit scores necessarily transforms an entity into a credit repair organization subject to the requirements and prohibitions of the CROA. The court therefore concludes that the Debt Free Life Membership and Coaching Program did not render Edge a credit repair organization. While that program may have the desired effect of improving a participant's credit score, the advice provided on ways to reestablish credit, such as obtaining a passbook loan or a secured credit card, are simply ways of "encouraging

10

creditworthy behavior."

A closer question is whether the services that Edge represented it would provide upon completion of the Debt Melt Down Program rendered Edge a credit repair organization. The Agreement Letter stated:

> If the fee paid to Edge is $600.00 or greater, you are entitled to participate in The Post Closing Credit Restoration Program. The purpose of this program is to assure that your credit reports properly reflect the settlement and paid accounts that involved this program. This program is voluntary for you and its success is dependent upon your proper participation and follow through as directed. Edge Solutions, Inc. cannot guarantee any specific results with regards to this program.

The letter captioned "How the Debt Melt Down Program Works" stated: "Upon completion of the program, Edge will work with you for 12 months in a best effort rehabilitation of your credit rating." The Dear Customer Letter stated that deterioration of credit was not unusual during participation in the Debt Melt Down Program and that Edge would "help modify it upon completion of the program." The "Frequently Asked Questions" document stated under the heading "How Does the Program Effect Credit?": "[O]nce you are debt free, the accounts will indicate a paid or settled status. Within 6 to 12 months, you will be well on your way to total recovery."

These representations are sometimes contradictory. For example, the Agreement Letter indicates that payment of at least $600 in fees to Edge is required to receive post-program help with the participant's credit whereas the letter captioned "How the Debt Melt Down Program Works" indicates that completion of the program is required. Some of the representations are also vague. The Dear Customer Letter stated that Edge would "help the participant modify [his credit]" and the letter captioned "How the Debt Melt Down Program Works" references "a best effort rehabilitation of [the participant's] credit rating."

11

If the Post Closing Credit Restoration Program were the only service offered by Edge in these documents, or even a primary aspect of the Edge program, the court would agree with Plattner that offering this program causes Edge to fall within the definition of a credit repair organization, subject to the requirements of the CROA. When viewed in context of the services offered by Edge as a whole, however, it is clear that Edge is not offering services that have the express or implied purpose of improving a participant's credit. Edge's customers participate in the Post Closing Credit Restoration Program only <u>after</u> completing, or at least participating in, the Debt Melt Down Program. As discussed above, the Debt Melt Down Program documents make clear that the purpose of the Program is to assist the consumer in getting his or her debts managed and paid, and that damage to a participant's credit is likely to occur during participation in that program. The express purpose of the Post Closing Credit Restoration Program is merely to help a participant in the Debt Meltdown Program repair any damage done to his credit as a result of his participation in the Program.

Thus, the overall purpose of Edge's services is not to improve a participant's credit score but rather to help a participant settle his debt. Even an unsophisticated debtor reviewing the program documents could not be left with the impression that Edge was offering to improve his credit except insofar as paying one's debts is likely, ultimately, to have that effect.[5]

---

[5]Because it was issued after the present motions were fully briefed, neither party cited the case most factually similar to the instant case. In *Polacsek*, the court evaluated whether representations by a credit counseling agency ("CCA") rendered the CCA a credit repair organization under the CROA. *Polacsek v. Debticated Consumer Counseling, Inc.*, No. Civ. PJM 04-631, 2005 WL 3750247, at *1 (D. Md. Nov. 23, 2005). The representations included that the program would "IMPROVE CREDIT" by "reaging [*sic*] accounts" which would "improve [the consumer's] credit rating" and that "unlike other debt management companies, [the CCA would] provide [the consumer] with very important 'back-end services' to help keep your credit protected and clean. [The CCA's] credit report review will make sure [the consumer

12

The court thus concludes that with respect to the representations made to Plattner, Edge is not a credit repair organization under the CROA. Since the provisions Plattner alleged that Edge violated (15 U.S.C. § 1679b(b), § 1679c, § 1679d, and § 1679e) limit their prohibitions and requirements to credit repair organizations, summary judgment is granted in favor of Edge as to Counts I-IV.

B.    Breach of Fiduciary Duty

Since no federal claims remain, the court relinquishes jurisdiction over Plattner's pendent state claim for breach of fiduciary duty. *Wright v. Associated Ins. Cos.,* 29 F.3d 1244, 1251 (7th Cir. 1994) ("The general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolve them on the merits."). Summary judgment is granted in favor of Edge as to Count V.

---

is] not being mismarked [*sic*] with someone else's debt." *Id.* at * 8.  The court held that these representations were sufficient to show that the CCA sold credit repair services. *Id.*

    *Polacsek* is distinguishable from the instant case because Edge never made any representations that the Debt Melt Down Program and the Post Closing Credit Restoration Program would have a positive impact on a participant's credit. Instead, the program documents make several disclaimers that the effect on credit was outside the scope of the program, and the program documents make no promise of overall credit improvement.

    Additionally, the court in *Polacsek* suggested, without deciding, that a company may not be a credit repair organization if credit repair services are ancillary to the company's primary business. *Polacsek*, 2005 WL 3750247, at *6 ("Arguably an entity's credit repair activities will be so ancillary to its [credit] counseling activity as to be *de minimus* and therefore not subject to CROA."). In this case, the court notes that the program documents show that, to the extent that Edge was offering any "credit repair services," these services were ancillary to the Debt Melt Down Program.

## III. Conclusion

For the foregoing reasons, Edge's motion for summary judgment is granted, and Plattner's motion for summary judgment is denied.

ENTER:

____/s/_____
Joan B. Gottschall
United States District Judge

Dated: March 22, 2006